Nos. 24-5849(L), 24-5894

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

EIGHT MILE STYLE, LLC; MARTIN AFFILIATED, LLC,

*Plaintiffs-Appellants Cross-Appellees*,

v.

SPOTIFY USA INC.,

*Defendant-Appellee Cross-Appellant*,

and

KOBALT MUSIC PUBLISHING AMERICA, INC.; HARRY FOX AGENCY, LLC,

*Defendants-Appellees* [24-5849],

*Defendants* [24-5894].

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville, No. 3:19-cv-00736
Hon. Aleta Arthur Trauger

**BRIEF OF DIGITAL MEDIA ASSOCIATION AS
*AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-
APPELLEES AND IN SUPPORT OF AFFIRMANCE**

Kenneth L. Steinthal          David P. Mattern
KING & SPALDING LLP          KING & SPALDING LLP
50 California Street          1700 Pennsylvania Avenue NW
Suite 3300                    Suite 900
San Francisco, CA 94111      Washington, DC 20006
(415) 318-1200               (202) 737-0500
ksteinthal@kslaw.com         dmattern@kslaw.com

*Counsel for Amicus Curiae*

June 5, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Digital Media Association certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

*/s/ David P. Mattern*
David P. Mattern

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES......................................................................iv

INTEREST OF *AMICUS CURIAE*.........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT........................3

BACKGROUND.......................................................................................6

    A.    Pre-MMA Mechanical Licensing Process............................10

    B.    MMA's "Grand Compromise"................................................13

ARGUMENT............................................................................................15

I.    The MMA Created a Compulsory Blanket License for All "Available" Musical Works.............................................................15

    A.    The Plain Text and Structure of the MMA Provides for a Comprehensive Blanket License....................................16

        1.    "Blanket License" Means Comprehensive Coverage......................................................................16

        2.    The Statutory Structure of Section 115 Distinguishes Between Pre-MMA Compulsory Licenses and MMA Statutory Blanket Licenses........18

    B.    A Comprehensive Blanket License Is Consistent With the Goals of the MMA..................................................20

II.    Eight Mile Style's Arguments to Avoid the Comprehensive Blanket License Would Unravel the MMA....................................24

    A.    Eight Mile Style's "Foreclosure" Theory Clashes With The Text of the MMA.........................................................24

    B.    The "Foreclosure" Theory Ignores Congress's Intent to Quell Uncertainty and Inefficiency, and Disrupts the Industry-Wide Understanding of the MMA...................26

1.    Eight Mile's Attempt to Unravel the "Grand Compromise" ................................................... 26

2.    Revival of Substantial Infringement Liability for DMPs ..................................................... 29

3.    Deleterious Effects on the Music Marketplace ............ 30

III.  Spotify Was Entitled to Summary Judgment That It Was Licensed as of Its Blanket License on January 1, 2021 ................ 31

CONCLUSION .......................................................................... 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Ferrick v. Spotify USA Inc.*,
  2018 WL 2324076 (S.D.N.Y. May 22, 2018) ...................................... 12

*Garland v. Cargill*,
  602 U.S. 406 (2024) ................................................................... 16

*Walters v. Metro. Educ. Enters., Inc.*,
  519 U.S. 202 (1997) ................................................................... 16

*Williams v. Taylor*,
  529 U.S. 420  (2000) .................................................................. 16

## Statutes

17 U.S.C. § 115(a) ....................................................................... 18

17 U.S.C. § 115(b) ................................................................... *passim*

17 U.S.C. § 115(d) ................................................................... *passim*

17 U.S.C. § 115(e) ....................................................................... 17

17 U.S.C. § 504(c) ....................................................................... 12

## Other Authorities

164 Cong. Rec. E1319 (daily ed. Sept. 27, 2018) ...................................... 9

164 Cong. Rec. S6260 (daily ed. Sept. 18, 2018) ................................. 9, 10

Bass, Matthew
  Recording Industry of Am., Vice President,
  RIAA 2024 Year-End Revenue Report (Mar. 2025),
  https://www.riaa.com/wp-content/uploads/2025/03/
  RIAA-2024Year-End-Revenue-Report.pdf ........................................... 2

Complaint,
  *Eich v. Apple Inc.*,
  No. 1:17-cv-9857 (S.D.N.Y. Dec. 17, 2017), Dkt. 1 ............................. 12

Complaint,
  *Lowery v. Rhapsody Int'l, Inc.*,
  No. 4:16-cv-1135 (N.D. Cal. Mar. 7, 2016), Dkt. 1 ............................. 12

H.R. Rep. No. 115-651 (2018) ................................................................... 31

Ingham, Tim
  *Over 60,000 Tracks Are Now Uploaded to*
  *Spotify Every Day. That's Nearly One per Second*,
  MUSIC BUSINESS WORLDWIDE (Feb. 24, 2021),
  https://www.musicbusinessworldwide.com/over-60000-
  tracks-are-now-uploaded-to-spotify-daily-thats-nearly-
  one-per-second/ ....................................................................................... 8

Letter from Lindsey O. Graham, Chairman,
  S. Comm. on the Judiciary, to Shira Perlmutter,
  Register of Copyrights (Sept. 30, 2020),
  https://www.copyright.gov/rulemaking/mma-transition-
  reporting/mma-payment-dispute-letter.pdf ........................................ 22

MERRIAM-WEBSTER (June 1, 2025),
  https://www.merriam-webster.com/dictionary/blanket ..................... 17

MERRIAM-WEBSTER (May 26, 2025),
  https://www.merriam-webster.com/dictionary/license ...................... 17

Mulligan, Mark
  *How the DNA of a hit has changed over 20 years*,
  MIDIA RSCH. (July 13, 2020), https://tinyurl.com/5xbe3myd ............. 11

Press Release,
  Digit. Licensee Coordinator, Statement from the Digital
  License Coordinator on Transfer of Historical Royalty
  Payments (Feb. 16, 2021), https://tinyurl.com/ydbjs5na ................... 13

*Protecting and Promoting Music Creation for the 21st*
  *Century: Hearing Before the S. Comm. on the Judiciary*,
  115th Cong. (2018), https://tinyurl.com/mm7unsz2 .................... 12, 23

S. Rep. No. 115-339 (2018) ........................................................... 20, 21, 22

## INTEREST OF *AMICUS CURIAE*

Amicus is the Digital Media Association ("DIMA"), a trade association that represents the world's leading audio streaming services and innovators: Amazon, Apple Music, Feed.fm, Pandora, Spotify[1], and YouTube. DIMA's members operate services that collectively connect millions of listeners worldwide with virtually the entire body of recorded music. DIMA's mission is to promote and protect the ability of music fans to engage with creative content whenever and wherever they want and for artists to more easily reach old fans and make new ones.

DIMA members played a crucial role in the revitalization of the music industry. Just a decade ago, the music industry grappled with declining revenues, crippling music piracy issues, and existential litigation risk that hindered innovation and growth. Fast-forward to today, as a result of the efforts of DIMA's members and their rightsholder partners, streaming revenues in the United States grew to "a record high

---

[1] No party nor counsel for any party in this litigation (including Spotify) authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Defendants-Appellees in 24-5894 have consented to the filing of this brief. Plaintiffs-Appellants are opposed.

[of] $14.9 billion [in 2024] . . . account[ing] for 84% of total revenues" for recorded music in the United States (most of which goes to record labels and music publishers).[2]

This growth in revenues has been fostered, in significant part, by the 2018 passage of the Music Modernization Act ("MMA"), which revamped Section 115 of the Copyright Act to provide for a "blanket license" that DIMA members and rights owners alike now utilize to license mechanical rights in music.

As such, DIMA and its members have a strong interest in the interpretation of the Section 115 blanket license, including in ensuring that the Section 115 blanket license remains—as its text demands and as Congress intended—a blanket license for mechanical rights.

---

[2] Matthew Bass, Recording Industry of Am., Vice President, RIAA 2024 Year-End Revenue Report 1 (Mar. 2025), https://www.riaa.com/wp-content/uploads/2025/03/RIAA-2024Year-End-Revenue-Report.pdf.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

Amicus submits this brief, in support of Defendants-Appellees and Cross-Appellant, to address an important issue about the meaning of the Music Modernization Act that may be addressed by this Court as an alternate basis to affirm the judgment below. *See* Brief of Defendant-Appellee/Cross-Appellant Spotify USA Inc. 74–79 (Dkt. 31).

For years, digital music providers and rightsholders struggled under an unworkable process that required them to send song-by-song notices to obtain compulsory licenses to the mechanical rights to stream music. This one-by-one process required digital music providers to send millions of individual notices. And in many cases neither publishers, licensees, nor the entities administering the licenses knew with certainty who owned the rights to license musical works. The upshot was tremendous administrative costs, delayed payouts to rightsholders who could not be identified, and significant infringement risk to digital music providers.

Congress sought to eliminate that process through the MMA, a statute reflecting a once-in-a-generation consensus among all sectors of the music industry and its Congressional champions. The MMA replaced

the byzantine "notice of intention" process for digital uses with a blanket license that conferred rights to "*all* musical works (or shares of such works) available for compulsory licensing under this section." 17 U.S.C. § 115(b)(4)(B)(i), (d)(1)(B)(i) (emphasis added). That is, rather than send millions of notices, digital music providers could secure the rights to "all musical works" through a single license.

The blanket license was meant to eliminate the potential for gaps that arose under a process in which a digital music provider needed to send notices for each of the millions of works it streamed. Indeed, under the old process, the mechanical licensing marketplace was in crisis. Infringement risk and uncertainty threatened the very future of the digital music providers, including DIMA's members, and the entire streaming marketplace that they made possible—even though they helped combat widespread piracy and turned declining revenues into rapid gains for artists and songwriters.  Along with creating a blanket license, the MMA corrected this uncertainty by narrowing copyright liability that may have arisen under the pre-MMA "notice" process.

In the court below, Eight Mile sought to re-write the blanket license's grant of rights in "*all* musical works" to mean something less. It

proclaimed that Spotify's purported failure to secure licenses under the *pre*-MMA notice process somehow "forecloses" Spotify's ability to secure a MMA blanket license covering that work. But Eight Mile's reading finds no support in the MMA. To the contrary, Congress plainly differentiated between the MMA and the pre-MMA processes. Paragraph (b)(2)(B) and (d)(2) enshrine the procedure for the MMA blanket license (which is available as of January 1, 2021) whereas (b)(2)(A) describes the pre-MMA process (which was available prior to January 1, 2021). And Congress underscored this differentiation when discussing limitations on the availability of a license: licensees that failed to follow the pre-MMA requirements under subsection (b)(2)(A) were foreclosed from securing a pre-MMA license, but such a failure has no impact on the licensee's ability to secure an MMA blanket license under subsection (b)(2)(B).

Eight Mile's "foreclosure" theory also aims to undo the benefits and certainty Congress intended the MMA to deliver to digital music providers and copyright owners. It would re-insert the same uncertainty that plagued the pre-MMA process—and that the MMA was designed to fix—by requiring digital music providers to show that they had properly sent a "notice of intention" under the old licensing system.

Eight Mile's "foreclosure" theory deserves no reprise today. If this Court addresses the meaning of the MMA, it should reject Eight Mile's "foreclosure" theory and conclude that Defendant-Appellees were entitled to summary judgment at least as of January 1, 2021.

## BACKGROUND

Congress created the first compulsory license for mechanical reproduction of musical compositions, more than a century ago, in 1909. This 1909 compulsory license conferred the right for distributors to create physical copies of musical compositions for distribution *en masse* for two cents per copy upon satisfaction of two requirements: (1) the copyright owner filed a notice of use with the Copyright Office alerting the Office that the musical work had been mechanically reproduced; and (2) the distributor served the copyright owner with a notice of intention if they wished to use the license (and filed a copy of such notice with the Copyright Office).

The impetus for this new license procedure was then novel analog technologies: the early 1900s ushered in phonorecords and perforated piano rolls, with the latter half of the century embracing cassette tapes and audio compact discs. These technologies created physical copies of a

songwriter's work, and Congress's 1909 compulsory license scheme to secure the rights to create these copies worked satisfactorily. The 1909 compulsory license scheme remained until 1976, when the Section 115 compulsory license was born. Section 115 retained the requirement for licensees to serve a Notice of Intention on the copyright owner (or the Copyright Office if the owner is unknown) but removed the requirement for licensors to file a Notice of Use.

The advent of digital technology in the late 1990s revolutionized the consumption and transmission of recorded works: it made listening to music more accessible, improved the audio quality of works, and simplified songwriters' ability to distribute their works at scale. While digital technology transformed the way Americans consumed and created recorded works, Section 115 was unable to keep up with these technological transformations. *See also infra*, Background Section A. Congress, for the time being, temporarily stitched Section 115 back together by expanding the scope of the compulsory license to digital phonorecords and deliveries thereof, but failed to address the emerging problems with the song-by-song model that digital copies would bring.

Digital music providers (DMPs), which emerged in the 2000s, ruptured Congress' temporary fix. The high volume of reproductions and the method of distributing these reproductions broke the Section 115 compulsory license system. While cassette tapes generally held a mere 60 minutes of recorded audio and the late '90s' digital transmissions were limited to individual songs or albums, DMPs made available to consumers practically all recorded music. Tens of thousands of new tracks are uploaded to Spotify each day.[3] Clearing every single musical work for mechanical licensing one-by-one, as required by the 1976 version of Section 115 (i.e., the pre-MMA mechanical licensing process) was, simply put, impossible, even apart from the issues of copyright ownership uncertainty and infringement risk. *See infra*, Background Section A.

The entire music industry—songwriters, music publishers, record companies, and the DMPs (led by DIMA)—agreed that the 1976 version of the Section 115 compulsory license proved infeasible in the digital

---

[3] Tim Ingham, *Over 60,000 Tracks Are Now Uploaded to Spotify Every Day. That's Nearly One per Second*, MUSIC BUSINESS WORLDWIDE (Feb. 24, 2021), https://www.musicbusinessworldwide.com/over-60000-tracks-are-now-uploaded-to-spotify-daily-thats-nearly-one-per-second/.

world. So, in 2018, licensors and licensees, alongside Congressional champions, engaged in a "grand compromise" to find a solution. That solution, now enshrined in the MMA, was the creation of a new compulsory license structure that provided substantial benefits both to DMPs and the music publishing industry. *See, infra*, Background Section B. Instead of requiring a licensee to serve and file a notice of intention (NOI) for every musical work, the MMA created a *blanket* license that allowed the digital reproduction of every available copyrighted work, to be administered by an entity paid for by DMPs and charged with locating and paying the applicable rights owners. This new blanket license was created to remedy the critical faults in the pre-MMA mechanical licensing process—and was recognized by all involved as a landmark set of promises and tradeoffs.[4]

---

[4] *See, e.g.*, 164 Cong. Rec. E1319 (daily ed. Sept. 27, 2018) (extension of remarks of Rep. Bob Goodlatte stating that he "challenged the [music] industry to put their differences aside and to come together to create a unified reform bill, and to their credit, they delivered. This legislation has the support of songwriters, musical works copyright owners, digital music providers, individual artists, sound recording copyright owners, artist guilds, and performing rights organizations."); 164 Cong. Rec. S6260 (daily ed. Sept. 18, 2018) (statement of Sen. Lamar Alexander) ("We have been able to get so far because the songwriters and the publishers and the digital music companies and the broadcasters and the

### A.    Pre-MMA Mechanical Licensing Process

Before the MMA, compulsory mechanical licenses were available solely on a work-by-work basis. As briefly discussed above, a DMP would need to identify the copyright owner of *each and every* song offered on its service and send an individualized NOI to each copyright owner in advance (or within 30 days) of streaming the track.

Even as licensed digital music services helped to combat piracy and revolutionize the music industry, the NOI system confronted the DMPs with the challenging task of clearing each of those millions of works on their services one by one. This task was made even more difficult by the lack of centralized information regarding the copyright ownership of the musical works. There was no definitive database that matched musical works with recordings on the one hand and their copyright owners on the other. And even if there was such a database, record companies, when distributing new releases to the DMPs, seldom knew the precise

---

record labels and others decided to work together over the last 2 or 3 years on what they agree on instead of on what they disagree."); 164 Cong. Rec. S6260 (daily ed. Sept. 18, 2018) (statement of Sen. Lamar Alexander reading on behalf of Sen. Chuck Grassley) ("The Music Modernization Act will really help songwriters, artists, publishers, producers, distributors, and other music industry stakeholders. This bill is the product of long and hard negotiations and compromise.").

copyright ownership of the musical works embodied in the new releases. In fact, music publishers also often did not know what portions of a musical work they owned at the time of release. Combining that with the common practice of fractional licensing of co-written works,[5] DMPs were often uncertain of where to even send many NOIs.

For such works, where DMPs did not know the true owner(s) of a musical work on a given recording, DMPs were typically relegated to the process (as spelled out in the pre-MMA version of Section 115) of sending NOIs to the Copyright Office instead of the (unknown) copyright owner. This longstanding practice faced challenges in the pre-streaming era, but it became increasingly unworkable when millions of tracks were involved. And this issue did not only affect DMPs: the music publishing community was similarly displeased, as Section 115 specified that DMPs were excused from paying royalties on such works until the work was registered and the owner identified. *See, e.g.*, *Protecting and Promoting*

---

[5] The nature of songwriting has changed over time, with the average number of songwriters per song increasing over the last 20 years from 2.4 to 4. Each of these songwriters can have unequal shares in the composition copyright claim and each may be affiliated with a different music publisher. *See* Mark Mulligan, *How the DNA of a hit has changed over 20 years*, MIDIA RSCH. (July 13, 2020), https://tinyurl.com/5xbe3myd.

*Music Creation for the 21st Century: Hearing Before the S. Comm. on the Judiciary*, 115th Cong. (2018), https://tinyurl.com/mm7unsz2 (statement of David M. Israelite, President & CEO, Nat'l Music Publishers' Ass'n) (referencing 60 million "royalty-free" NOIs filed with the Copyright Office by DMPs). As a result, the work-by-work NOI process created a huge pool of unpaid royalties for certain works.

In addition to having to manage the costly and inefficient NOI system, DMPs were exposed to substantial copyright infringement damages—up to $150,000 per work infringed[6]—for any errors made in the process. Offering catalogs of millions of songs on the rapid-fire release schedule of the music business inevitably led to mistakes and gaps in license coverage. These oversights led to a raft of class action and individual music publisher lawsuits seeking hundreds of millions, if not billions, of dollars in statutory copyright infringement damages from major DMPs. *See, e.g.*, *Ferrick v. Spotify USA Inc.*, 2018 WL 2324076, at *9 (S.D.N.Y. May 22, 2018); Complaint, *Lowery v. Rhapsody Int'l, Inc.*, No. 4:16-cv-1135 (N.D. Cal. Mar. 7, 2016), Dkt. 1; Complaint, *Eich v. Apple Inc.*, No. 1:17-cv-9857 (S.D.N.Y. Dec. 17, 2017), Dkt. 1. And more

---

[6] *See* 17 U.S.C. § 504(c).

generally, these and many other issues led to a climate rife with uncertainty and liability risk that curbed investment, wasted resources, and drained money from both services and songwriters.

### B.    MMA's "Grand Compromise"

Enter the MMA. With so much at stake, the parties brought a long list of demands and concessions to the bargaining table, and the bill was hotly negotiated. Songwriters and publishers, for their part, secured many benefits from the DMPs, including the DMPs' agreement to make immediate payment of the accrued royalties for unmatched works to the Mechanical License Collective ("MLC") in exchange for a statutory limitation on liability for pre-MMA uses of works that may not have been licensed properly. Twenty different DMPs, from smaller startups to the largest and most established services, transferred a combined \$424.4 million in historical unmatched royalties and accompanying historical usage information to the MLC so that it could identify and distribute royalties to the proper recipients, or to other musical work rights owners to the extent the royalties remain unclaimed.[7] Songwriters and

---

[7] *See* Press Release, Digit. Licensee Coordinator, Statement from the Digital License Coordinator on Transfer of Historical Royalty Payments (Feb. 16, 2021), https://tinyurl.com/ydbjs5na.

publishers also benefitted from the MMA's requirement that DMPs provide ongoing usage data and make royalty payments to the MLC whether ownership is known or unknown, replacing the pre-MMA process where DMPs were excused from payment until the owner correctly registered the work.

The MMA's grand bargain included a number of other provisions, including:

(a) the MLC being entirely funded by the DMPs on top of royalties they pay;

(b) a change to a market-based rate-setting standard to govern Copyright Royalty Board ("CRB") proceedings;

(c) a centralized public database of song-ownership information and an ownership portal allowing copyright owners to identify and claim their songs;

(d) the ability of the ASCAP and BMI rate courts to consider label royalties as benchmarks when setting royalty rates for musical works performances, which had previously been forbidden;

(e) relief from the cumbersome NOI process (including bulk electronic NOIs that publishers had difficulty processing); and

(f) elimination of certain royalty-free licenses.

Two aspects of the MMA were essential to the DMPs' support of the legislation. *First*, in exchange for payment of historical unmatched royalties, the MMA narrowed infringement liability where the NOI process had failed (due to the ineffective process described above) for lawsuits initiated in 2018 or later. 17 U.S.C. § 115(d)(10). *Second*, starting on January 1, 2021, the MMA provided DMPs with a "blanket license" that would provide comprehensive coverage and eliminate the work-by-work licensing process and infringement exposure (and attendant litigation) that existed prior to the MMA. *Id.* § 115(d). This blanket license coverage was central to the "grand compromise" between songwriters and DMPs.

## ARGUMENT

### I.     The MMA Created a Compulsory Blanket License for All "Available" Musical Works

The plain text and structure of the MMA, in addition to the congressional intent and industry understanding, make it clear: the MMA's compulsory blanket license confers coverage for all available musical works. Eight Mile's contrary interpretation—that a work is a part of the blanket license only if a DMP had a valid license to work under the pre-MMA system—would upend the MMA's text and purpose.

A.     **The Plain Text and Structure of the MMA Provides for a Comprehensive Blanket License**

1.     **"Blanket License" Means Comprehensive Coverage**

Start with the statutory text. *Garland v. Cargill*, 602 U.S. 406, 415 (2024). A DMP that "qualifies for a compulsory license under subsection (a) may, by complying with the terms and conditions of this subsection, obtain *a blanket license* from copyright owners" under the MMA. 17 U.S.C. § 115(d)(1)(A) (emphasis added). The statute, then, defines the scope of the blanket license as "cover[ing] *all* musical works (or shares of such works) available for compulsory licensing under this section . . . ." *Id.* § 115(d)(1)(B)(i) (emphasis added). And the statute structurally delineates between pre-MMA compulsory licenses and MMA blanket licenses. *Compare id.* § 115(b)(4)(B)(i)(I) *with id.* § 115(b)(4)(B)(i)(II). The statute is also clear that the blanket license covers "*all* musical works." *Id.* § 115(d)(1)(B)(i) (emphasis added).

To understand what "blanket license" means, we begin by "giv[ing] the words of a statute their 'ordinary, contemporary, common meaning,' absent an indication Congress intended them to bear some different import." *Williams v. Taylor*, 529 U.S. 420, 431 (2000) (quoting *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997)). Breaking "blanket

16

license" into its constituent parts, "blanket" operates as an adjective and modifies a type of "license." "Blanket," in an adjective use-case, means "covering all members of a group or class without individual apportionment" or "effective or applicable in all instances or contingencies." MERRIAM-WEBSTER (June 1, 2025), https://www.merriam-webster.com/dictionary/blanket. "License," in a nominal use-case (and in relevant context), means "a grant by the holder of a copyright or patent to another of any of the rights embodied in the copyright or patent short of an assignment of all rights." MERRIAM-WEBSTER (May 26, 2025), https://www.merriam-webster.com/dictionary/license. Stitching the constituent parts back together, the plain meaning of "blanket license" here is a grant of all copyrights (without individual apportionment) held by a copyright holder to another.

Section 115(e) confirms this common-sense meaning. The MMA's "definitions" subsection defines blanket license as "a compulsory license described in subsection (d)(1)(A) to engage in covered activities." 17 U.S.C. § 115(e)(5). Subsection (d)(1)(A) states a DMP that qualifies under subsection (a) may obtain a blanket license. In turn, Section 115(d)(1)(B)(i) provides that a blanket license covers "*all* musical works

(or shares of such works) *available for compulsory licensing* under this section." (Emphasis added). The term "available" used here refers back to subsection 115(a),[8] which is aptly titled "*Availability* and scope of compulsory license in general." (Emphasis added). There, the statute states that a work is available for compulsory licensing whenever the licensee has "the primary purpose" of distributing the work "to the public for private use," subject to other criteria, none having anything to do with whether the work was licensed under the prior regime. *Id.* § 115(a)(1). Nothing in the text of the Section 115 suggests that a blanket license was limited to works that had been licensed under the old, pre-MMA system.

### 2. The Statutory Structure of Section 115 Distinguishes Between Pre-MMA Compulsory Licenses and MMA Statutory Blanket Licenses

As discussed *supra*, Congress introduced this blanket license in the MMA to replace the cumbersome pre-MMA NOI process—and drew a clear line between the pre-MMA licenses and the new MMA blanket licenses. The new MMA blanket license procedures are articulated in subsection (d)(2) and apply to licenses on or after January 1, 2021. *See*

---

[8] This is further confirmed by Subsection (d)(1)(A)'s reference to subsection (a).

*id.* § 115(d)(2); (b)(2)(B) ("[O]n or after the license availability date, shall, before making any such digital phonorecord delivery, follow the procedure described in subsection (d)(2)"). The old, pre-MMA compulsory license procedures are articulated in subsection (b)(2) and apply to licenses before that date. *See id.* § 115(b)(2)(A).

Congress intended to inter the pre-MMA licensing process and end the uncertainty it caused—not, as Eight Mile appears to argue, perpetuate questions about historic work-by-work NOI licensing indefinitely into the future. Under the pre-MMA compulsory licensing system, DMPs were required to send a NOI to *each copyright owner* (or the Copyright Office) to obtain a compulsory license "prior to the license availability date." *Id.* § 115(b)(2)(A). For a DMP, this could require them to send millions of individual NOIs. If a DMP failed to serve a NOI as required under this system, then the DMP would be foreclosed from "the possibility of a [pre-MMA] compulsory license under such paragraph." *Id.* § 115(b)(4)(B).

In sharp contrast, under the new MMA blanket licensing system, DMPs need only send *one* Notice of License to the mechanical licensing collective for a blanket license to all copyrighted works. *Id.* § 115(d)(2).

There is no analogue to the pre-MMA NOI process that would foreclose a DMP from a license for a particular work.

This, in fact, mirrors Congress' intended demarcation between the pre-MMA and MMA compulsory licensing schemes:

> Subsection (b)(4)(A) [pertaining to the pre-MMA compulsory license] maintains the current practice whereby record labels that fail to serve or file a notice of intent are foreclosed from the possibility of obtaining a compulsory license for that work. Subsection (b)(4)(B) [pertaining to the new MMA blanket license] provides penalties for a digital music provider for failing to file a notice of intent or notice of license. Again, this subsection distinguishes between activities that occur *prior* to the date of availability of the blanket license and activities that occur *after*. Before the date of availability of the blanket license, if the digital music provider fails to serve a notice of intent on the musical work copyright owner (as described in subsection (b)(2)), then the digital music provider is foreclosed from obtaining a compulsory license for use of that particular work under such subsection. After the date the blanket license is available, if the digital music provider fails to submit the notice of license on the mechanical licensing collective, then the digital music provider is foreclosed from obtaining a blanket license for 3 years.

S. Rep. No. 115-339, at 4 (2018) (emphasis added).

## B.  A Comprehensive Blanket License Is Consistent With the Goals of the MMA

Text and structure aside, the MMA was designed to quell the uncertainty and inefficiencies around pre-MMA compulsory licenses by replacing the individualized NOI process with a blanket license. Eight

Mile's efforts to read an exception into the blanket license would inject these same inefficiencies back into the MMA system. "[T]he existing music licensing system d[id] not functionally work to meet the needs of the digital music economy where commercial services strive to have available to their customers as much music as possible." S. Rep. No. 115-339, at 4. And because "the law has not kept pace with the music industry to reflect changes in consumer preferences and technological developments . . . [the MMA] update[d] music copyright laws by creating a new compulsory blanket licensing system for mechanical works." *Id.* at 1–2.

Congress's "primary focus of the legislation [was] the creation of a new compulsory blanket license" to remedy functional issues plaguing both licensors and licensees under the pre-MMA regime. *Id.* at 10. First, the pre-MMA "[s]ong-by-song licensing negotiations increase[d] . . . transaction costs," resulting from the laborious individualized NOI process. *See id.* at 4. Second, the MMA's blanket license was meant to address the fact that copyright ownership information is often opaque and inaccurate. As Congress observed, "the failure of the music industry to develop and maintain a master database has led to significant

litigation and underpaid royalties for decades." *See id.* at 8. The uncertainty as to who owned particular works created huge infringement risk for licensees, who often could not be sure whether they had obtained all of the necessary rights to stream a musical work. *See id.* at 13–14.

Congress also appreciated the "grand compromise" given that "[t]he legislation contains a key component that was necessary to bring the various parties together in an effort to reach common ground by limiting liability for digital music providers after January 1, 2018, so long as they undertake certain payment and matching obligations." *See id.* at 14. The common ground reforms were integral to achieving the "intent of the MMA": "provide legal certainty for past, present, and future usage . . . ." *See* Letter from Lindsey O. Graham, Chairman, S. Comm. on the Judiciary, to Shira Perlmutter, Register of Copyrights 1 (Sept. 30, 2020), https://www.copyright.gov/rulemaking/mma-transition-reporting/mma-payment-dispute-letter.pdf (emphasis added). Eight Mile's position would achieve exactly the opposite.

The industry's understanding—both of licensees and licensors—of the MMA's mission is wholly consistent with Congress. DIMA's CEO Chris Harrison testified to Congress that "[a]ntiquated procedures for

utilizing the Section 115 license have forced digital music providers to curtail their catalog or risk copyright infringement litigation. Business uncertainty has reduced investments in new products and services and discouraged new market entrants." *Protecting and Promoting Music Creation for the 21st Century*, https://tinyurl.com/mm7unsz2 (statement of Christopher Harrison, CEO, DiMA). Similarly, NMPA's CEO David Israelite testified that songwriters' "livelihood is threatened by the failure of law to keep pace with technology" and that the MMA "works to correct many of the outdated and antiquated provisions of U.S. copyright laws that today impede the proper functioning" of the market. *Protecting and Promoting Music Creation for the 21st Century*, https://tinyurl.com/mm7unsz2*supra*.

The key attraction of the MMA from DIMA's perspective was "a *true* blanket license covering all musical works protected by copyright and available upon the filing of a single notice of license." *Protecting and Promoting Music Creation for the 21st Century*, https://tinyurl.com/mm7unsz2 (statement of Christopher Harrison). "The MMA's new blanket license," Mr. Harrison explained, "will enable digital music providers to offer a complete catalog of music to consumers without risk

of copyright infringement." *Id*. "Digital music providers submit one application to the MLC that covers all music available on the service—a true blanket license." *Id*.

And that is what the statute provides: a "blanket license." As to the liability shield, its chief selling point—clearly appreciated and articulated by Congress—was to erase liability for gaps in the NOI process, not to reintroduce it.

## II. Eight Mile Style's Arguments to Avoid the Comprehensive Blanket License Would Unravel the MMA

### A. Eight Mile Style's "Foreclosure" Theory Clashes With The Text of the MMA

Despite the plain text and structure of Section 115, Eight Mile advances a novel argument that musical works are only included in an MMA blanket license if DMPs secured a compulsory license for that musical work under the old, pre-MMA Section 115 process. To cobble that argument together, Eight Mile wrongly seeks to inject the pre-MMA compulsory licensing system within the MMA new blanket licensing system. In doing so, Eight Mile loses sight of the plain meaning and the statutory definition of "blanket license" and convolutes the structure of the statute.

Eight Mile's theory, which rests on 17 U.S.C. § 115(b)(4)(B)(i)(I), fails as a matter of simple statutory construction. That section provides that the failure to serve a NOI as required by paragraph (b)(2)(A) "forecloses" the possibility of a compulsory license *only* "under such paragraph," i.e., paragraph (2)(A). Paragraph (2)(A), in turn, deals solely with the process for obtaining a compulsory license during the period "prior to the license availability date." MMA's blanket licenses (and the procedures therefor) are only available *after* the license availability date. In other words, the provisions Eight Mile relies on are limited to the period before the license availability date and have nothing to do with eligibility for a blanket license after that date.

Instead, there is, however, a separate and distinct set of provisions that address the specific circumstances under which the *blanket license* is foreclosed: 17 U.S.C. § 115(b)(4)(B)(i)(II) and (b)(2)(B). These paragraphs establish that blanket license foreclosure only occurs when one fails to follow the blanket notice processes of § 115(b)(2)(B). But these provisions in no way suggest that access to works under the MMA blanket license is foreclosed by one's prior failure to follow the *pre*-MMA dictates of paragraph (2)(A).

25

Based on its pre-MMA foreclosure theory, Eight Mile advocates for a world where DMPs can only secure a less-than-blanket license that does not actually cover all musical works because of a past failure under the pre-MMA NOI system. This ignores what the text, structure, and intent of Section 115 make clear: blanket licenses *are* comprehensive; they provide *blanket* coverage. A DMP's past actions under the pre-MMA compulsory license system have absolutely no impact on its ability to secure comprehensive blanket coverage under the MMA.

### B.   The "Foreclosure" Theory Ignores Congress's Intent to Quell Uncertainty and Inefficiency, and Disrupts the Industry-Wide Understanding of the MMA

In addition to belying the plain text of Section 115, Eight Mile's "foreclosure" theory ignores the MMA's "grand compromise" between songwriters and DMPs, contradicts Congress's expressed intent of reducing uncertainty and inefficiencies around pre-MMA compulsory licenses, and amplifies risks that the MMA intended to prevent.

#### 1.   Eight Mile's Attempt to Unravel the "Grand Compromise"

Eight Mile's "foreclosure" theory is nothing but an attempt to unravel the "grand compromise."

26

First, it would turn the blanket license into something that is not a blanket at all, but a spotty patchwork that would sacrifice the certainty of comprehensive license coverage and replace it with the need to investigate, song-by-song, which songs, among catalogs numbering as high as 100 million songs, were and were not properly cleared via the NOI process in the years before enactment—a task only further complicated by inevitable and regular changes in publishing ownership for many tracks occurring in the intervening years.

Second, the foreclosure theory would decimate the MMA's liability shield, exposing services to the same sort of infringement liability they experienced in the pre-MMA era for playing any song under the blanket license for which an NOI was not properly sent prior to the license availability date.

Indeed, the situation would be even worse than before for activity during the period between the 2018 enactment of the MMA and the 2021 blanket license availability date, during which the MMA removed the option of filing NOIs with the Copyright Office. *See* 17 U.S.C. § 115(b)(2)(A). For any works added to a service during that period where the DMP did not know the copyright owner—and was thus unable to

27

serve an NOI directly within the statutorily prescribed period (before or within 30 days of first offering the work)—the DMP would not only be foreclosed from using the work under the blanket license, but exposed to infringement liability for its use—this not due to any fault of its own, but because the MMA deprived it of the ability to file an NOI with the Copyright Office for the work.[9]

The above-described consequences of the foreclosure theory also completely defy the industry-wide understanding of the MMA and would gut its fundamental purpose. Congress made it abundantly clear that the central focus of the MMA was to create a new licensing system that eliminated the uncertainties around copyright ownership by creating a new master database and vesting authority for its contents in the MLC; Eight Mile's foreclosure theory would reopen those settled issues.

---

[9] In the end, the blanket license under Eight Mile's foreclosure theory would add few practical protections for DMPs relative to the pre-MMA era: it would cover works properly licensed in the past (which weren't the problem) but *exclude* works not properly licensed pre-MMA (which were the problem)—basically leaving DMPs in as bad a situation as before (if not worse) save for avoiding the time of issuing NOIs for new releases.

### 2. Revival of Substantial Infringement Liability for DMPs

In addition to being irreconcilable with the MMA's fundamental bargain, the "foreclosure" theory would expose services to potentially substantial liability that the MMA was meant to close off (and which would now very likely be closed off anyway under the Copyright Act's three-year statute of limitations). DIMA members (representing much of the music streaming industry) have uniformly been operating since January 2021 according to the industry-wide understanding that Section 115 confers, as everyone intended, a "true" blanket license and complete liability shield. To accept the foreclosure theory, by contrast, the Court would need to conclude not only that the entire streaming industry has it wrong, but that there is no fix to this problem, notwithstanding passage of the MMA, because any failure to file an NOI before MMA blanket license availability (which the old statute required before or within 30 days of a song first being offered by a DMP) forever foreclosed compulsory licensing for such works.

It is difficult (indeed impossible) to believe that Congress could have intended such a result without spelling it out explicitly—or that the MMA would excuse the use of works without an NOI prior to blanket

license availability, only to expose DMPs to going-forward liability after January 1, 2021, for those same works based on that same (previously excused) lack of notice. All signs point to the contrary: the MMA was meant to solve the problems of the pre-MMA regime, not exacerbate or resuscitate past problems in a new form. And the MMA was a compromise—carefully negotiated by Congress with the input and participation of industry stakeholders—in which DIMA members made significant concessions in exchange for the benefits that the foreclosure theory would strip away: a comprehensive blanket license and a full liability shield. There is simply no way (as the legislative history recognizes) that DIMA, on behalf of its members—whose most basic product offering, after all, is a comprehensive, all-inclusive catalog of songs available to be streamed on-demand—would have compromised as it did only to receive a license riddled with holes from "foreclosed" works.

### 3.     Deleterious Effects on the Music Marketplace

Various other constituencies Congress meant to protect in the MMA would also be hurt were the foreclosure theory adopted. Consumers, for one, would be hurt as DMPs would instead be forced to remove "foreclosed" songs from their services to avoid further liability—or to

avoid individual negotiations with the owners of such songs. *See* H.R. Rep. No. 115-651, at 5 (2018) ("Song-by-song licensing negotiations increase the transaction costs to the extent that only a limited amount of music would be worth engaging in such licensing discussions."). And copyright owners—songwriters, music publishers, recording artists, and record companies alike—would lose royalties otherwise generated from those songs. Those copyright owners would also see royalties frittered away by costly litigation, directly violating Congress's oft-stated goal of avoiding such litigation. *See id*. at 13–14 ("The Committee welcomes such agreement since continued litigation generates unnecessary administrative costs, diverting royalties from artists.").

## III. Spotify Was Entitled to Summary Judgment That It Was Licensed as of Its Blanket License on January 1, 2021

As an alternate basis to affirm the judgment below in part, Spotify argues that the MMA's blanket license authorized Spotify's use of Eight Mile's works after the license became available on January 1, 2021. *See* Brief of Defendant-Appellee/Cross-Appellant Spotify USA Inc. 74–79 (Dkt. 31). Spotify is correct.

As of January 1, 2021, Section 115 blanket licenses "cover[] all musical works (or shares of such works) available for compulsory

31

licensing." *Id.* § 115(d)(1)(B), (d)(3)(B)(i)(II)(aa). Every single Eight Mile musical work was so available: Eight Mile has previously authorized distribution of sound recordings embodying each Work in one form or another. Because Eight Mile's works are available for compulsory licensing, *all* of its works are available under the MMA blanket license. Eight Mile, moreover, does not dispute that Spotify properly obtained the MMA compulsory blanket license. *See* Spotify Opposition to Plaintiffs' Motion for Summary Judgment, R.556, PageID# 42318. Because all Eight Mile works were covered under the MMA blanket license and Spotify properly secured such a license, Spotify operated under MMA blanket license coverage—barring Eight Mile's infringement claims after January 1, 2021.

Further, by erroneously intertwining the foreclosure mechanism from pre-MMA law with the MMA blanket licensing procedures, Eight Mile's "foreclosure" theory contradicts the plain meaning of blanket licenses under the MMA, belies Congressional intent and industry understanding of the MMA, and retrogresses licensing procedures to a time of uncertainty, inefficiency, and existential infringement risk. This Court need not grace that theory with an encore. To the extent this Court

does not simply affirm on the same basis as the district court, it should nevertheless conclude that the MMA independently authorized Spotify's use of Eight Mile's works since January 1, 2021.

## CONCLUSION

This Court should affirm the judgment below.

Respectfully submitted,

*/s/ David P. Mattern*

| | |
|---|---|
| Kenneth L. Steinthal | David P. Mattern |
| KING & SPALDING LLP | KING & SPALDING LLP |
| 50 California Street | 1700 Pennsylvania Avenue NW |
| Suite 3300 | Suite 900 |
| San Francisco, CA 94111 | Washington, DC 20006 |
| (415) 318-1200 | (202) 737-0500 |
| ksteinthal@kslaw.com | dmattern@kslaw.com |

*Counsel for Amicus Curiae*

June 5, 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5). This brief contains 6,332 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 MSO in 14-point Century Schoolbook font.

Date: June 5, 2025

/s/ David P. Mattern
David P. Mattern

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that service will be accomplished upon all registered counsel of record by the appellate CM/ECF system.

*/s/ David P. Mattern*
David P. Mattern

*Counsel for Amicus Curiae*